**Rodrigo MARTINEZ Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**NUMBER 13–15–00295–CR**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed March 9, 2017

Rehearing Overruled May 23, 2017

---

1. The supersedeas order provided that the first supersedeas payment was due ten days from the date of the order.

George William "Jorge" Aristotelidis, 310 South St. Mary's Street, Suite 1830, San Antonio, TX 78205, Attorney of Record for the Appellant.

Ricardo P. Rodriguez, Hidalgo County District Attorney, Glenn W. Devino, Assistant District Attorney, Luis A. Gonzalez, Assistant District Attorney, 100 N. Closner, Room 303, Edinburg, TX 78539, Attorneys of Record for the Appellee.

Before Justices Contreras, Benavides, and Longoria

## OPINION

Opinion by Justice Benavides

By eight issues, appellant Rodrigo Martinez, Jr. appeals his conviction for theft of property in an aggregate amount of $200,000 or more, a first-degree felony. *See* Tex. Penal Code Ann. §§ 31.03, 31.09 (Act of 2011, 82nd Leg., ch. 1234 (amended 2015)) (current version at Tex. Penal Code Ann. § 31.03(e)(7) (West, Westlaw through 2015 R.S.)).[1] Martinez argues that: (1) the evidence was legally insufficient to support the conviction; (2) the evidence is legally insufficient to show that the charge was not barred by the statute of limitations; (3) the trial court committed jury charge error; (4) the trial court abused its discretion by allowing the State to put on his former client as a rebuttal witness; (5) the trial court abused its discretion by allowing the State to improperly impeach a witness; (6) the State improperly asked questions intended to inflame the minds of

---

1. Martinez was indicted in 2012, when the Texas Penal Code made theft of property in an amount of $200,000 or more a first-degree felony. *See* Tex. Penal Code Ann. § 31.03 Act of 2011, 82nd Leg., ch. 1234 (amended 2015) (current version at Tex. Penal Code Ann. § 31.03(e)(7) (West, Westlaw through 2015 R.S.)). The law was amended in 2015 to make theft of property in an amount of $300,000 or more a first-degree felony. We will follow the law in effect at the time of the indictment.

the jury; (7) the trial court's comments regarding an adverse witness erased the impartiality of the court; and (8) there was cumulative error. Additionally, the State raises a cross-appeal regarding the restitution amount by stating the oral pronouncement by the trial court is not properly reflected in the judgment. We affirm as modified.

## I. BACKGROUND

Martinez was indicted by the grand jury on June 6, 2012 and the indictment was filed with the district court on that day. *See id.* The underlying offense came from the theft of funds from Elena Cantu (Cantu). Money was alleged to have been taken from April 2004 up until the last theft which was alleged to have occurred on June 7, 2007.

Cantu had purchased ten acres of land in Edinburg, which she had been renting out to farmers. Cantu retired and decided she wanted to develop the land for residential purposes. Cantu's nephew, Richard Longoria, recommended she meet with Martinez because Martinez had experience in real estate development.

In April 2004, Cantu and Martinez executed a business contract for the development of the ten acres of land, which they named Coyote Run. That contract listed the price of development as $150,000 and listed Martinez as the broker and developer.[2] Cantu made an initial payment of $30,000 to Martinez. In March 2005, Cantu secured a loan with First National Bank (FNB) in Mission in the amount of $400,000. Cantu testified she wanted a more hands-off approach to this development and trusted Martinez to handle it due to his experience. At the time the first loan with FNB was secured, Cantu and Martinez prepared the land for apartments to be built. Martinez hired Eduardo Martinez, Sr. (Eduardo) of AD & EE Construction (AD & EE) as the general contractor on the project.

Shortly after Cantu secured the loan, Martinez and Eduardo drafted up a draw request from the loan for $51,364.00. Cantu and Martinez signed the draw request, which was approved by the bank. Martinez deposited the check into his law office interest on lawyer's trust account (IOLTA), which is designated for client funds. Three months after the draw request, Jorge Perez (Perez), a civil engineer with Perez Engineering, was hired to begin working with the City of Edinburg (the City) to secure the proper authorization and permits required to build.

Draw requests continued from Martinez and Eduardo through 2005 and 2006 for substantial sums of money. Although Eduardo and Perez testified that getting proper approval from the City took a lengthy amount of time, there was little work being done on Cantu's property. Cantu testified she asked when work would be starting and Martinez always assured her there were buyers waiting for the land. Cantu stated that Martinez had told her she could expect to sell the land for $1.388 million dollars and such assurances are what convinced her to keep withdrawing money from the loan.

During this same time period, AD & EE was also working on other projects, including Martinez's personal home. Money continued to be withdrawn out of Cantu's loan account and Martinez continued to write checks to AD & EE. In the meantime, Martinez's home was completed. Cantu testified that she was not aware that AD &

---

**2.** Martinez is also a licensed attorney in the State of Texas, but the contract listed Martinez as a developer. Cantu did not hire Martinez in his capacity as an attorney in this transaction.

EE was constructing Martinez's home at the same time they were supposed to be working on her development. Additionally, although Martinez had also taken out a loan for the construction of his house with FNB, he was depositing his loan funds into his IOLTA account, commingling them with Cantu's funds as well as other client monies.

In March 2007, Cantu and Martinez returned to FNB. Cantu's loan was about to mature and more money was needed to complete her project. Ruben Plata, the president of the FNB–Mission branch, was able to get an additional amount approved on Cantu's loan. Cantu initially requested $525,000, but Plata was only able to obtain approval of $515,000 from the bank. Cantu and Martinez executed an amended agreement, which changed the land from lots for apartments to lots for residences. The next two draw requests following the increase in the loan amount were denied by FNB. At least four draw requests were submitted by Martinez in early 2007. Many of the draw requests repeated items from prior requests.

Cantu testified that she continued to approve draw requests and withdraw money because she wanted the subdivision completed. Only minimal work was ever completed on her land.

FNB sent multiple letters of acceleration until Cantu was not able to provide the monies required. She eventually lost the land to foreclosure to the bank, with still minimal improvements to it. Martinez never returned money to Cantu or developed the property.

The State called Aurora Martinez (Aurora) of AD & EE as a witness. Aurora stated that Martinez was never an owner or director of their company. But the State impeached Aurora with a mechanic's lien that listed Martinez "doing business as" or dba AD & EE. Aurora still claimed that Martinez had nothing to do with their business and no kickbacks were exchanged. Aurora claimed AD & EE was only paid for work performed, even though evidence showed minimal work towards the completion of Coyote Run.

Eduardo also testified as a State's witness and stated he was hired to be the general contractor and that he normally requests clients' money before starting work. Eduardo testified he stopped business dealings with Coyote Run around 2007 and was paid approximately $300,000 for the work on Coyote Run. Eduardo testified that many of the draw requests were necessary in order to put deposits or lock in prices on materials, but those materials were never used or returned to Cantu. Eduardo testified that they never used Cantu's materials on other jobs and none of Cantu's money was used to build Martinez's home. Eduardo further still believes he was owed money for the project, even though it was not completed.

Guadalupe Botello of Botello Mortar and Grading, a subcontractor, testified that he submitted a bid for completion of the subdivision and was awarded the job. Botello installed the sewer line for Coyote Run and submitted an invoice for $43,000. However, Botello was never paid and stopped his work. Botello testified he was only paid slightly over $9,000 for cleaning a canal, which was separate work from his bid. Botello testified he stopped working on Coyote Run due to the lack of payment, and Eduardo avoided him after he tried to collect his money.

The State also called Plata from FNB. Plata testified about how a loan process would work regarding real estate. Plata assigned loans to his various loan officers, who were supposed to follow the progress of the real estate developments. Plata also testified that the bank released funds

based on the draw requests, and that any use of the money for something other than what was listed on the draw request would constitute fraud. Plata spoke about IOLTA accounts and interpreted the bank statements submitted as evidence. He stated that Martinez's IOLTA account had insufficient funds in multiple months and that this should never happen because it was clients' money in the account. On cross-examination, Plata stated that Martinez's home loan was for $525,000, the exact same amount Cantu was told to request when the loan was increased.

Perez, a civil engineer on the project, stated he was not aware that Botello was not paid for his work. Perez also billed $36,000 and was paid "maybe half" of the amount. Perez sent a letter of termination to Eduardo and received a letter from Martinez, identifying himself as Eduardo's attorney. Perez drafted a new contract to stay on the job, but never heard anything back from Eduardo or Martinez.

Martinez called multiple witnesses who testified to his reputation in the community. Martinez also testified in his own defense. Martinez stated he approached Eduardo about helping develop Coyote Run because Martinez had never developed a residential subdivision before. Martinez stated he was never trying to make a profit off of Cantu. Martinez testified he relied on the bank loan officers and Eduardo to make sure the project was moving ahead as scheduled. Martinez admitted to taking Cantu's loan money from the draw requests and depositing it into his IOLTA account. Martinez stated that he deposited everything into his IOLTA account: loan proceeds, settlements, client payments, his personal monies. Martinez said he paid everything out of that one account. He claimed he never used Cantu's money for anything other than the Coyote Run project and that she asked him to pay off a loan and some taxes for her with the money she had given him.

On cross-examination, Martinez stated he believed he handled Coyote Run to the best of his ability and disagreed that he did not perform all of the work under the contract. Martinez placed blame for the subdivision's failure on Eduardo, the bank, the City, and Cantu. Martinez testified that he also now realizes the problem with commingling money in an IOLTA account because it is easy to start using other people's money. The State showed multiple exhibits where Martinez's IOLTA account balance would drop below the amount placed in there from Cantu's loan, making clear that Cantu's money was being used for other purposes.

On rebuttal, the State called Sonia Martinez de Garza (Sonia), a former client of Martinez. She testified that she asked Martinez to help her combine some business entities, but they did not end up going through with the consolidation. Sonia testified she paid Martinez $5,000, only had two meetings with him, asked for the money or an accounting, and never received the accounting or money in return.

During the jury charge conference, Martinez asked for a specific instruction regarding the statute of limitations, which the trial court denied. The jury found Martinez guilty as charged in the indictment. The trial court sentenced Martinez to seven years in the Texas Department of Criminal Justice—Institutional Division and ordered restitution in the amount of $416,000 on the record. This appeal followed.

## II. Sufficiency of the Evidence

By his first issue, Martinez challenges the sufficiency of the evidence.

### A. Standard of Review

When evaluating a sufficiency challenge, the reviewing court views the evidence in the light most favorable to the verdict to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and a reviewing court is not to substitute its judgment as to facts for that of the jury as shown through its verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflict in favor of the verdict, even if it is not explicitly stated in the record. *Id.*

A reviewing court must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* In order to have reversal of a conviction on a claim of insufficiency of the evidence, Martinez must show that no rational jury could have found all the elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 902.

### B. Applicable Law

A person commits an offense of theft of property if he unlawfully appropriates property with the intent to deprive the owner of the property. Tex. Penal Code Ann. § 31.03. Appropriate means "to acquire or otherwise exercise control over property other than real property." *Id.* at § 31.01(4) (West, Westlaw through 2015 R.S.). The intent to deprive an owner of his property means an intent "to withhold the property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." *Id.* § 31.01(2)(A). Appropriation is unlawful if it is without the owner's effective consent. *Id.* Consent is not effective if induced by deception. *Id.* § 31.03(3)(A); *see Taylor v. State*, 450 S.W.3d 528, 535 (Tex. Crim. App. 2014). There are two statutory definitions of "deception" that are relevant here:

1. creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgement of another in transaction, and that the actor does not believe to be true; or

2. promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

*Taylor*, 450 S.W.3d at 535–36 (quoting Tex. Penal Code Ann. § 31.01(1)(A), (E)).

The Texas Penal Code "allows multiple thefts committed pursuant to one scheme or continuing course of conduct—at different times and against different victims—to aggregate within one offense for the purposes of the offense grade." *Anderson v. State*, 322 S.W.3d 401, 407–08 (Tex. App.–Houston [14th Dist.] 2010, pet. ref'd) (quoting Tex. Penal Code Ann.

§ 31.09). "Aggregation under section 31.09 creates a single new offense for jurisdiction, punishment, and statute of limitations purposes." *Id.* at 408. "Each individual theft and its elements become an element of the aggregate theft offense." *Id.* "The limitations period for aggregate theft begins to run after the last theft is completed." *Id.* "Aggregated theft is an offense with continuing conduct that ends with the last theft, and not after." *Id.* "Moreover, 'theft by exercising control is committed and the statute of limitations commences once possession of the property becomes unlawful.' " *Id.* (quoting *Barnes v. State*, 824 S.W.2d 560, 562–63 (Tex. Crim. App. 1991), *overruled on other grounds by Proctor v. State*, 967 S.W.2d 840, 842 (Tex. Crim. App. 1998)).

▮▮▮▮▮ Additionally, theft involving a contract or a written agreement, such as the one between Cantu and Martinez, presents a special set of circumstances.

> A claim of theft made in connection with a contract . . . requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property. In that circumstance, the State must prove that the appropriation was a result of a false pretext, or fraud. Moreover, the evidence must show that the accused intended to deprive the owner of the property at the time the property was taken. In reviewing the sufficiency of the evidence, though, we should look at events occurring before, during, and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.

*Taylor*, 450 S.W.3d at 536. However,

> a contractor may yet be found guilty of theft if, at some point after the formation of the contract, he formulates the requisite intent to deprive and appropri-

ates *additional* property by deception; that is, he induces his customer to make further payment on the contract while no longer intending to perform, or at least knowing that he will not.

*Id.* (emphasis in original); *see Ehrhardt v. State*, 334 S.W.3d 849, 856 (Tex. App.–Texarkana 2011, pet. ref'd) (stating the requisite criminal intent can be formed after the formation of a contract). "Moreover, the fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation." *Taylor*, 450 S.W.3d at 536.

> To correctly apply the *Jackson* standard, it is vital that courts of appeals understand the difference between a reasonable inference supported by evidence at trial, speculation, and a presumption. A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. . . . In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

*Johnson v. State*, No. 02-15-00357-CR, 513 S.W.3d 190, 197–98, 2016 WL 7163298 at *5 (Tex. App.–Fort Worth Dec. 8, 2016, no pet.).

**C. Discussion**

▮▮▮ Martinez argues that the evidence developed by the State was pure speculation and conjecture; however, he fails to account for the documentary proof. The

State presented multiple witnesses throughout the trial who testified to what occurred regarding the Coyote Run development. The only witnesses who testified about actual work performed at Coyote Run were Eduardo and Botello. Eduardo claimed there was substantial work done on Coyote Run, from applying for and receiving permits from the City to reserving materials to actual work being done on the land. However, Botello testified about the work that was evident on the actual land at Coyote Run. There was a ditch cleared and a sewer line installed; but Botello testified he stopped working when he was not paid.

Even though work stopped on the land early on, Martinez continued to present draw requests to Cantu and withdraw money from Cantu's loan with her signatures on the draw requests. The State presented evidence of Martinez's IOLTA account bank statements that showed that after Cantu's draw checks were deposited, large sums of money were paid out by Martinez to Eduardo or other entities that were not involved in Coyote Run. The bank statements also showed the balance of Martinez's IOLTA account dropping below the amount deposited by the draw checks, thereby showing that Martinez was spending more money than he was taking in, and although requesting money from Cantu's loan, no work was being done on Coyote Run. Plata testified that the bank considers not using the funds for the purpose identified in the draws fraud.

The evidence shows that Martinez was building his personal residence during the same time he drew money from Cantu's loan account. Although Eduardo testified none of Cantu's money was used for Martinez's house, the State presented the checks written from the IOLTA account to Eduardo, showing that some but very few of them had information written in the memo line designating that the money being given to Eduardo was exclusively for Coyote Run.

Based on the evidence presented by the State, a rational juror could have logically presumed or inferred that Martinez continued to draw money out of Cantu's loan for his own personal gain, and was fully aware that Coyote Run would not be a completed subdivision. We conclude the jury was well within its right to believe the evidence presented by the State showed the appropriate culpable mental state by Martinez to deprive Cantu of her monetary property and constitute theft. We overrule Martinez's first issue.

## II. STATUTE OF LIMITATIONS

By his second issue, Martinez challenges the sufficiency of the evidence relating to the five-year statute of limitations.

### A. Standard of Review

■ "We review whether the statute of limitations for an offense has expired prior to the charge under a *de novo* standard of review." *Villarreal v. State*, 504 S.W.3d 494, 511 (Tex. App.–Corpus Christi 2016, no pet. h.).

### B. Applicable Law

■ The statute of limitations for felony theft is five years from the date of the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 12.01(4)(A) (West, Westlaw through 2015 R.S.).

At trial, the defendant may assert the defense by requesting a jury instruction on limitations if there is some evidence before the jury, from any source, that the prosecution is limitations-barred. If there is some such evidence and the defendant requests a jury instruction on the limitations defense, then the State must prove beyond a reasonable doubt

that the prosecution is not limitations-barred.

*Tita v. State*, 267 S.W.3d 33, 39 (Tex. Crim. App. 2008) (quoting *Proctor v. State*, 967 S.W.2d 840, 844 (Tex. Crim. App. 1998)). "When a defendant is charged with theft in an aggregate amount pursuant to one scheme or continuing course of conduct, the state is not required to prove each individual appropriation." *Kent v. State*, 483 S.W.3d 557, 561 (Tex. Crim. App. 2016).

### B. Discussion

Prior to trial, Martinez had filed a motion to dismiss the indictment arguing the indictment was outside the statute of limitations. The trial court denied this motion. During trial, Martinez requested a statute of limitations instruction in the jury charge, which was also denied. However, the trial court instructed the jury on the relevant statute of limitations for this offense, just not in the same language Martinez had requested.

In his brief, Martinez approaches each individual transaction as a theft that the State should have been required to prove fell within the statute of limitations. However, under the aggregate theft statute, the continuing course of conduct creates one event encompassing all the thefts alleged in the time period in the indictment. *See id.* Martinez was indicted by the grand jury on June 6, 2012 and the indictment was filed with the district court on that day. The last theft alleged by the State occurred on June 7, 2007 when the money was disbursed by the FNB to Martinez and Perez Consulting Engineers. Aggregate theft is an offense involving continuing conduct that ends with the last theft, and not after. *See Anderson*, 322 S.W.3d at 407–08. Since the indictment was within the five–year period after the last theft occurred, the State was within

the statute of limitations. The trial court properly denied Martinez's statute of limitations motions to dismiss. We overrule Martinez's second issue.

### III. JURY CHARGE ERROR

By his third issue, Martinez asserts the trial court committed error by refusing to include his requested statute of limitations jury instruction in the jury charge.

### A. Standard of Review

"In analyzing a jury-charge issue, our first duty is to decide if error exists." *Rodriguez v. State*, 456 S.W.3d 271, 280 (Tex. App.–Houston [1st Dist.] 2014, pet. ref'd) (citing *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g)). Only if error is found, do we then consider whether an objection to the charge was made and analyze for harm. *Id.* "The degree of harm necessary for reversal depends upon whether the error was preserved." *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

If "an error is preserved with a timely objection. . . . then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (citing *Almanza*, 686 S.W.2d at 171). The Texas Court of Criminal Appeals "has interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal." *Rodriguez*, 456 S.W.3d at 280.

To establish harm, the "appellant must have suffered actual, rather than theoretical, harm." *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) (citing *Almanza*, 686 S.W.2d at 171). Neither the State nor the appellant bears the burden on appeal to prove harm. *Reeves v.*

*State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

## B. Applicable Law and Discussion

Martinez submitted a request for a jury instruction that dealt with the statute of limitations related to theft:

You are instructed that the statute of limitations for the offense of theft is 5 years. This means that an indictment must be presented within 5 years of the date of the commission of the offense, if one was committed. The time period is measured by excluding both the day of the offense, if any, was committed and the day the indictment was presented. An indictment is considered presented when it has been duly acted upon by the grand jury and received by the court.

Therefore, if you find from the evidence beyond a reasonable doubt that the offense of theft as alleged in the indictment was committed, but you further find from the evidence that the act occurred more than 5 years before the presentment of the indictment, or if the prosecution has failed to persuade you beyond a reasonable doubt that the act occurred within 5 years before the presentment of the indictment, you will acquit the defendant and say by your verdict "not guilty."

The trial court denied Martinez's requested instruction, but instead included the following instruction regarding the statute of limitations:

You are instructed that the allegation that the offense was committed on or about the 28th day of March 2005, to on or about the 7th day of June 2007, does not bind the State to any one particular date but may include any day prior to June 6, 2012, the day the indictment was filed. The statute of limitations for Theft is five years.

The jury charge submitted by the trial court erroneously instructed the jury that a conviction could be had as long as the offense was committed any time prior to the day the indictment was filed. *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011) (stating that the jury charge must include the appropriate limitations based on statute). The jury charge in *Taylor* was similar to the one found in our case: it stated an offense could be committed anytime within the period of limitations, which was ten years in that case. *See id.* Having found error, we will now analyze for "some harm." *See Sanchez*, 376 S.W.3d at 774.

We review "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. We will examine "any ... part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Id.* at 174.

We begin our harm analysis with the entire jury charge. The trial court's instruction on the statute of limitations was contained in paragraph six of the jury charge. Although the instruction was the entirety of paragraph six, the charge defined many other words and was multiple pages. The instruction also defined the dates the State alleged the offense occurred for the jury to consider.

The evidence presented by the State centered very specifically on the financial transactions that took place from April 2004 through June 7, 2007. There was no testimony presented regarding additional draw requests following the June 6, 2007 draw request, and June 7, 2007 checks executed by FNB on Cantu's loan. The evidence centered on the time period al-

leged in the indictment and did not include any date later than June 7, 2007. Though the evidence conflicted as to Martinez's actions regarding Cantu's money and the IOLTA account deposits and withdrawals, the time period alleged by the State was never contested.

The closing arguments of counsel made minimal reference to the statute of limitations. During the first part of closing arguments, the State referred to the time period, stating the final date was what proved it was within the statute of limitations to prosecute Martinez. The State argues that it had one day to indict based on the five-year limitation. The State explained the date of the final transaction and why it is important to the limitations period. Martinez briefly touched on the statute of limitations passing in his closing as well.

Based on the jury charge, evidence presented, and the closing arguments, we cannot find that Martinez suffered any harm due to the erroneous jury instruction. We overrule Martinez's third issue.

## IV. ADMISSIBILITY OF EVIDENCE

By his fourth issue, Martinez argues the trial court abused its discretion by allowing the State's rebuttal witness to testify. By his fifth issue, Martinez alleges the trial court abused its discretion by allowing the State to impeach one of its witnesses with a statement.

### A. Standard of Review

■ We review a trial court's ruling to admit evidence for an abuse of discretion. *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008). In order to reverse a trial court's determination, we must find the trial court's ruling lies outside the zone of reasonable disagreement. *Id.* In applying an abuse of discretion standard, we will not disturb the trial court's evidentiary ruling if it is correct under any

applicable theory of law. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

■ Error in the admission of evidence is non-constitutional error and is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(b); *Taylor*, 268 S.W.3d at 592. We have construed this to mean that an error is only reversible when it has a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* "We should not overturn the conviction if we have fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect." *Id.*

### B. Applicable Law and Discussion

#### 1. Former Client Testimony

■ In rebuttal to Martinez's case-in-chief, the State called Sonia Martinez de Garza (Sonia) to testify about a business relationship with Martinez. Sonia testified she had paid Martinez $5,000 to represent her during a business matter in which she was attempting to consolidate her business with a business in Mexico. Sonia stated that she had a few meetings with Martinez, but the deal eventually fell through. She asked Martinez for receipts, an accounting of what money was used, and any left over money to be returned. Nothing was ever given to her by Martinez.

■ Prior to Sonia's testimony, Martinez objected that the State had not provided notice of her testimony under his Rule 404(b) request. *See* TEX. R. EVID. 404(b) (providing that the State must give reasonable notice of its intent to introduce evidence of extraneous bad acts). The trial court denied the objection. However, the State is not required to disclose the identity of rebuttal witnesses because normally

"when the State presents extraneous offense evidence in rebuttal to mitigation evidence offered by the defendant, advance notice of intent to offer the extraneous offense evidence is not possible." *Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002); *see Depena v. State*, 148 S.W.3d 461, 465 (Tex. App.–Corpus Christi 2004, no pet.).

Moreover, the testimony was admissible under Rule 404(b). *See* TEX. R. EVID. 404(b). Under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The trial court allowed the testimony. *See Gillette v. State*, 444 S.W.3d 713, 734–35 (Tex. App.–Corpus Christi 2014, pet. ref'd) (generally using exceptions to Rule 404(b)). The trial court did not abuse its discretion in doing so.

 Additionally, Martinez argues the trial court's ruling was compounded by the lack of a limiting instruction. However, Martinez did not request a limiting instruction at the time Sonia testified. Martinez did ask for a running objection to her testimony stating it was overly prejudicial and did not fall under a Rule 404(b) exception. *See* TEX. R. EVID. 404(b). "Because appellant did not request a limiting instruction at the first opportunity, the evidence was admitted for all purposes." *Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001). "If a limiting instruction is to be given, it must be when the evidence is admitted to be effective." *Id.* Additionally, the " 'party opposing evidence has the burden of objecting and requesting the limiting instruction at the introduction of evidence.' " *Id.* at 892 ((quoting *Garcia v. State*, 887 S.W.2d 862,

878) (Tex. Crim. App. 1994)). The absence of such a request " 'shall not be a ground for complaint on appeal.' " *Id.* at 893 (quoting TEX. R. EVID. 105(a)).

Therefore, we hold that the trial court did not abuse its discretion in allowing Sonia's rebuttal testimony to counter Martinez's testimony regarding intent. We overrule Martinez's fourth issue.

### 2. Impeachment of State's Witness

 Martinez argues the trial court abused its discretion by allowing the State to impeach its own witness with a statement that was not prepared by that witness.

The State called Aurora as a witness during its case-in-chief. However, during the examination, the State asked the trial court for permission to treat Aurora as a hostile witness, which the trial court granted. During cross-examination by Martinez, Aurora testified that Martinez was not an owner or director of her company, AD & EE, and had no financial interest in the company. On re-direct questioning, the State presented a mechanic's lien that had been previously filed with the county clerk in Hidalgo County that showed a judgment rendered against Martinez dba AD & EE.

Martinez argues in his brief the lien document should not have been admitted under Rule 612 of the rules of evidence. *See* TEX. R. EVID. 612 (regarding a writing used to refresh a witness's memory). However, an objection based on rule 612 was not made before the trial court and is thereby, waived. *See* TEX. R. APP. P. 33.1. Martinez also appears to argue under rule 613 in his brief, without citing to the rule. *See id.* R 613. (regarding a witness's prior statement). However, the mechanic's lien in question was not a prior inconsistent statement made by Aurora and therefore, not applicable. *See id.* Although Martinez states that the trial court erred in allowing

impeachment with a document the witness did not create, he cites to no authority. Therefore, any argument under rule 613 is not relevant and thereby, waived. *See* TEX. R. APP. P. 33.1.

Martinez also objected that the lien was improper hearsay. *See* TEX. R. EVID. 801(d) (regarding what constitutes hearsay). The State responded that the mechanic's lien was a public record on file with the county clerk's office, and therefore, was an exception to the hearsay rule. *See* TEX. R. EVID. 803(8) (exceptions to the hearsay rule). The trial court denied Martinez's objection to hearsay, stating that a public record is an exception to the hearsay rule. *See id.*

▮ Additionally, Martinez objected to lack of notice under Rule 404(b) and prejudice under Rule 403. *See id.* R. 403, 404(b). The State responded that the mechanic's lien did not constitute a bad act, so notice was not required to Martinez and it argued that the probative value of the evidence outweighed the prejudicial effect. *See id.* R. 403, 404(b). As the trial court noted on the record, both the State and Martinez questioned Aurora regarding Martinez's involvement in AD & EE. It was Martinez, though, who expanded the line of questioning by asking Aurora if Martinez was an owner or director of AD & EE or if Martinez had any financial interest in the company, to which Aurora responded "no." The State argued that Martinez "opened the door" for the admission of the lien by his line of questioning. "Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009), *cert. denied*, 560 U.S. 966, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010).

The trial court denied Martinez's objection to hearsay, stating the lien was an exception to the hearsay rule, and it also ruled that because both sides had brought up the issue of Martinez's affiliation with AD & EE, the probative value outweighed any prejudice and allowed the mechanic's lien into evidence. *See* TEX. R. EVID. 403, 803(8). Martinez asked for a running objection to the State's line of questioning.

We agree with the trial court's ruling that any probative value outweighed the prejudicial effect of the introduction of the mechanic's lien because both parties asked questions regarding Martinez's involvement in AD & EE. Therefore, we hold that the trial court did not abuse its discretion in admitting the mechanic's lien into evidence. We overrule Martinez's fifth issue.

## V. PROSECUTOR'S CONDUCT

▮ By his sixth issue, Martinez argues that the State's questions to Aurora were "clearly calculated to inflame the minds of the jury" and therefore, constituted reversible error. Martinez did not object to the State's line of questioning of Aurora. Because Martinez did not object to the State's questions, we hold Martinez did not properly preserve this issue for our review and overrule Martinez's sixth issue. *See* TEX. R. APP. P. 33.1.

## VI. TRIAL COURT IMPARTIALITY

▮ By his seventh issue, Martinez alleges the trial court's comments regarding an adverse witness caused its impartiality to be questioned.

### A. Standard of Review and Applicable Law

▮ "Most appellate complaints must be preserved by a timely request at the trial level." *Unkart v. State*, 400 S.W.3d 94, 98 (Tex. Crim. App. 2013); *see* TEX. R. APP. P. 33.1. "The 'traditional and preferred procedure' for seeking relief at trial for a complaint that must be preserved is '(1) to object when it is possible,

(2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient.'" *Id.* at 98–99 (quoting *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004)). "A party may skip the first two steps and request a mistrial, but he will be entitled to one only if a timely objection would not have prevented, and an instruction to disregard would not have cured, the harm flowing from the error." *Id.* "Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial." *Id.*

## B. Discussion

During the State's questioning of its witness Aurora, the following exchange occurred in front of the jury:

State: At this point, Your Honor, I'm going to declare her as an adverse witness and I'm going to ask that I be able to ask her leading questions, Judge.

. . . .

State: Yes, Your Honor I think we've—we've already gotten into it, that she's, she's been caught in one inconsistency already, Your Honor.

Court: I'm going to allow it in that she has had—yes, she's a difficult witness and has had inconsistencies in her testimony.

Defense: Judge, I'm going to object to the Court's comments about her being a difficult witness. It's highly improper, judge.

Court: Well, I'm going to allow you to—her to be declared a hostile witness to the State.

Defense: Judge, based on the Court's comments about Ms. Martinez, I'm going to ask for a mistrial in this case.

State: We don't believe a mistrial is warranted, Your Honor.

Defense: Well, judge, the only factfinders in this case are the jury. The judge—the Court is making a determination that she is a hostile witness and an adverse witness.

Court: Exactly. I'm making a determination that the—that she is a hostile witness to the State. I am not making any comments on any of the facts of the, of the case which only the jury can determine.

Although the trial judge did comment on the difficulty of questioning Aurora, the trial court clarified its statements as a determination of the witness's status, not a determination of the facts of the case or testimony. Any harm by the trial court's statement could have been cured by an instruction to disregard. *See id.* R. 102 ("If there were any residual harm, it would have been cured by a timely instruction to disregard the specific comment [that the] appellant found objectionable."). Martinez was not entitled to a mistrial based on the comment complained of, and he forfeited a lesser remedy by failing to request an instruction to disregard. *See id.* We overrule Martinez's seventh issue.

## VII. CUMULATIVE ERROR

By his eighth issue, Martinez alleges that the multiple errors committed by the trial court constituted cumulative error and entitle him to a reversal.

"Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'" *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (quoting *Chamberlain v. State*,

998 S.W.2d 230, 238 (Tex. Crim. App. 1999)); *see Jenkins v. State*, 493 S.W.3d 583, 613 (Tex. Crim. App. 2016). Though we found that the jury charge contained error, we concluded that the error was harmless. We have not found any other error. We overrule Martinez's eighth issue.

## VIII. RESTITUTION

By its cross-appeal, the State asks this Court to reform the judgment to accurately reflect the correct restitution amount. The trial court orally pronounced sentence at seven years in the Texas Department of Criminal Justice—Institutional Division and ordered restitution in the amount of $416,000. However, though the judgment correctly reflects the amount of incarceration time, it reflects restitution in the amount of $410,000.[3]

 "Fairness to the defendant requires that his sentence be 'pronounced orally in his presence.'" *Burt v. State*, 445 S.W.3d 752, 757 (Tex. Crim. App. 2014) (quoting *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004)). "A trial judge has neither the statutory authority nor the discretion to orally pronounce one sentence in front of the defendant, but then enter a different written judgment outside the defendant's presence." *Id.* A "written judgment is simply the 'declaration and embodiment' of that pronouncement." *Id.* (quoting *Taylor*, 131 S.W.3d at 502). Therefore, "when there is a conflict between the oral pronouncement and the written judgment, the oral pronouncement controls." *Id.*

An appellate court has the authority to reform a judgment as may be necessary to make the record speak the truth. *French v. State*, 830 S.W.2d 607, 609 (Tex.

Crim. App. 1992). Therefore, we modify the trial court's judgment to accurately reflect restitution in the amount of $416,000.00. *See* TEX. R. APP. P. 43.2(b).

## IX. CONCLUSION

We modify the trial court's judgment as to the restitution amount and affirm the judgment as modified. *See id.*

---

3. In his reply brief, Martinez concedes that the State's cross-appeal is correct and if we overrule his issues, the judgment should be modified to reflect the oral pronouncement of restitution by the trial court.